JEROME C. ROTH (State Bar No. 159483)
jerome.roth@mto.com
ROSEMARIE T. RING (State Bar No. 220769)
rose.ring@mto.com
JONATHAN H. BLAVIN (State Bar No. 230269)
jonathan.blavin@mto.com
VARUN BEHL (State Bar No. 295509)
varun.behl@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:     (415) 512-4000
Facsimile:     (415) 512-4077

Attorneys for Defendant
LINKEDIN CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| BRANTON LEA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>LINKEDIN CORPORATION,<br><br>Defendant. | Case No. 15-cv-00236 EJD<br><br>**LINKEDIN'S NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Judge:     Hon. Edward J. Davila<br>Date:      July 30, 2015<br>Time:      9:00 AM<br>Location: Courtroom 4 – 5th Floor |

# TABLE OF CONTENTS

**Page**

I.    BACKGROUND AND SUMMARY OF ALLEGATIONS ................................................. 4

    A.    The Add Connections Networking Tool .................................................................. 4

    B.    LinkedIn Members Consent To The Use of Their Names and Likenesses in Emails Promoting LinkedIn's Services .................................................................... 5

    C.    Plaintiff's Claims ..................................................................................................... 6

II.   LEGAL STANDARD FOR MOTION TO DISMISS .......................................................... 7

III.  ARGUMENT ....................................................................................................................... 8

    A.    Plaintiff's Common Law Right of Publicity Claim Should Be Dismissed Because Plaintiff Consented To The Challenged Use ............................................. 8

        1.    LinkedIn's User Agreement and Privacy Policy Establish Consent as a Matter of Law ............................................................................................ 8

        2.    Plaintiff Consented to The Use Of His Name and Likeness In Add Connections Emails ....................................................................................... 9

    B.    Plaintiff Lacks Article III Standing and Has Failed To Allege Any Cognizable Injury ................................................................................................... 12

    C.    Plaintiff's Derivative UCL Claims Should Be Dismissed ...................................... 18

        1.    There Are No "Unlawful" or "Unfair" Act Predicates............................... 18

        2.    Plaintiff's Derivative UCL Claims Fail for Lack of Statutory Standing ........................................................................................................ 19

IV.   CONCLUSION ................................................................................................................... 19

# TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*5381 Partners LLC v. Shareasale.com, Inc.,*
   2013 WL 5328324 (E.D.N.Y. Sept. 23, 2013) ........................................................................ 9

*Allen v. Wright,*
   468 U.S. 737 (1984) ............................................................................................................... 13

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ................................................................................................................. 7

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ................................................................................................................. 7

*Bennett v. Spear,*
   520 U.S. 154 (1997) ............................................................................................................... 15

*Clapper v. Amnesty Int'l USA,*
   —— U.S. ——, 133 S. Ct. 1138 (2013) ............................................................................ 3, 13

*Cohen v. Facebook,*
   798 F. Supp. 2d 1090 (N.D. Cal. 2011)
   2011 WL 5117164 (N.D. Cal. Oct. 27, 2011) ................................................................ passim

*Coho Salmon v. Pac. Lumber Co.,*
   30 F. Supp. 2d 1231 (N.D. Cal. 1998) .................................................................................. 15

*Faulkner v. ADT Sec. Servs., Inc.,*
   706 F.3d 1017 (9th Cir. 2013) ................................................................................................. 7

*Fraley v. Facebook, Inc.,*
   830 F. Supp. 2d 785 (N.D. Cal. 2011) ............................................................................ 14, 16

*Fteja v. Facebook, Inc.,*
   841 F. Supp. 2d 829 (S.D.N.Y. 2012) .................................................................................... 9

*Harwood Inv. Co. v. Wells Fargo Bank, Nat. Ass'n.,*
   2009 WL 4251650 (N.D. Cal. Nov. 24, 2009) ....................................................................... 7

*Ibey v. Taco Bell Corp.,*
   2012 WL 2401972 (S.D. Cal. June 12, 2012) ........................................................................ 8

*In re Doubleclick Inc. Privacy Litig.,*
   154 F. Supp. 2d 497 (S.D.N.Y. 2001) .................................................................................. 13

*In re JetBlue Airways Corp. Privacy Litig.,*
   379 F. Supp. 2d 299 (E.D.N.Y. 2005) .................................................................................. 13

# TABLE OF AUTHORITIES
## (Continued)

**Page**

*In re Google Inc.,*
  2013 WL 5423918 (N.D. Cal. Sept. 26, 2013).................................................... 9

*In re iPhone Application Litig.,*
  2011 WL 4403963 (N.D. Cal. Sept. 20, 2011)................................................... 13

*In re Yahoo Mail Litig.,*
  7 F. Supp. 3d 1016, 1024 (N.D. Cal. 2014) (Koh, J.) ................................... 7, 8, 9

*Jones v. Corbis Corp.,*
  815 F. Supp. 2d 1108 (C.D. Cal. 2011).............................................................. 8

*La Court v. Specific Media, Inc.,*
  2011 WL 1661532 (C.D. Cal. Apr. 28, 2011)................................................... 13

*Lapidus v. Hecht,*
  232 F.3d 679 (9th Cir. 2000)............................................................................. 7

*Monsanto Co. v. Geertson Seed Farms,*
  561 U.S. 139 (2010) ........................................................................................ 13

*Moretti v. Hertz Corp.,*
  2014 WL 1410432 (N.D. Cal. Apr. 11, 2014) .................................................. 9

*Navarro v. Block,*
  250 F.3d 729 (9th Cir. 2001)............................................................................. 7

*Newcombe v. Adolf Coors Co.,*
  157 F.3d 686 (9th Cir. 1998)............................................................................. 8

*Perez v. Nidek Co.,*
  711 F.3d 1109 (9th Cir. 2013)........................................................................... 7

*Perkins v. LinkedIn Corp.,*
  2014 WL 2751053 (N.D. Cal. June 12, 2014) ........................................... passim

*Shwarz v. United States,*
  234 F.3d 428 (9th Cir. 2000)............................................................................. 7

*Swift v. Zynga Game Network, Inc.,*
  805 F. Supp. 2d 904 (N.D. Cal. 2011) ............................................................. 9

*Zaltz v. JDATE,*
  952 F. Supp. 2d 439 (E.D.N.Y. 2013)............................................................... 9

MOTION TO DISMISS COMPLAINT

**TABLE OF AUTHORITIES**
(Continued)

Page

**STATE CASES**

*Aleksick v. 7-Eleven, Inc.*,
   140 Cal. Rptr. 3d 796 (Cal. Ct. App. 2012) ........................................................... 19

*Gregory v. Albertson's Inc.*,
   104 Cal. App. 4th 845 (Cal. 2002) ....................................................................... 19

*In re Tobacco II Cases*,
   207 P.3d 20 (Cal. 2009) ...................................................................................... 18

*Korea Supply Co. v. Lockheed Martin Corp.*,
   63 P.3d 937 (Cal. 2003) ...................................................................................... 19

*Maxwell v. Dolezal*,
   179 Cal. Rptr. 3d 807 (Cal. Ct. App. 2014) ........................................................... 12

*Slivinsky v. Watkins-Johnson Co.*,
   270 Cal. Rptr. 585 (Cal. Ct. App. 1990) ............................................................... 13

**STATE STATUTES**

Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL") .................................................... 6, 7

Cal. Bus. & Prof. Code § 17204 ........................................................................... 19, 18

**FEDERAL RULES**

Fed. R. Civ. Proc. 12(b)(1) ............................................................................. 1, 3, 13

Fed. R. Civ. Proc. 12(b)(6) ...................................................................... 1, 3, 7, 12, 13

**CONSTITUTIONAL PROVISIONS**

U.S. Const., art. III .......................................................................................... passim

**TREATISES**

Restatement (Second) of Torts § 892 ......................................................................... 8

**OTHER AUTHORITIES**

LinkedIn Ads Agreement, https://www.linkedin.com/legal/pop/pop-sas-terms ........................... 12

LinkedIn Privacy Policy, https://www.linkedin.com/legal/privacy-policy ........................... passim

LinkedIn User Agreement, https://www.linkedin.com/legal/user-agreement ........................... passim

PLEASE TAKE NOTICE that on July 30, 2015 at 9:00 a.m. before the Honorable Edward J. Davila in Courtroom 4 on the Fifth Floor of the above-entitled Court located at 280 South 1st Street, San Jose, California, Defendant LinkedIn Corporation ("LinkedIn") will move to dismiss Plaintiff's Complaint.  LinkedIn's motion is made pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Request for Judicial Notice filed herewith, the Declaration of Jonathan H. Blavin (and exhibits) filed herewith, all pleadings and papers on file in this matter, and such other matters as may be presented to this Court at the hearing or otherwise.

## STATEMENT OF RELIEF SOUGHT

LinkedIn seeks an order, pursuant to Rules 12(b)(1) and 12(b)(6), dismissing with prejudice the Complaint and each of its causes of action for failure to state a claim upon which relief can be granted and lack of standing.

## STATEMENT OF ISSUES TO BE DECIDED

1.    Whether the Complaint states a claim upon which relief can be granted.

2.    Whether Plaintiff has standing under Article III of the U.S. Constitution.

## MEMORANDUM OF POINTS AND AUTHORITIES

LinkedIn is the world's largest professional network, with more than 347 million members. In contrast to social networks used to share personal information among friends and family, LinkedIn allows members to connect with, find, and be found by current and potential business contacts to create professional networks online.  As with traditional business networking, the more connections a member has, the larger and more effective the member's professional network becomes, and the more exposure and opportunities the member enjoys.  LinkedIn provides members with a variety of tools to expand their networks, including one called Add Connections, which allows members to import their contacts' email addresses from their external email accounts and send connection invitation and reminder emails inviting those contacts to join their networks on LinkedIn.

Plaintiff brings meritless claims based on his contention that LinkedIn "misappropriated" his name and likenesses by sending emails that "implicitly suggest[]" that he "endorses" the Add

1   Connections feature – which Plaintiff refers to as the "contact uploader service."  *See* Compl. ¶¶ 5,

2   9, 31.  Specifically, Plaintiff alleges that LinkedIn used his name and profile picture in emails sent

3   to his LinkedIn connections, stating "Join . . . Branton (Brandy) Lea . . . and 58 other connections

4   who have already found people they know on LinkedIn," and providing a "link" to the Add

5   Connections feature.  *Id.*  ¶ 7.  Based on his contention that "[n]othing in the User Agreement or

6   Privacy Policy indicates that LinkedIn members consent to their name or profile picture being

7   used in a manner to advertise or endorse" Add Connections, *id.* ¶ 19, Plaintiff asserts claims under

8   California's common law right of publicity and California's Unfair Competition Law, *see id.*

9   ¶¶ 45–63.  Both claims fail as a matter of law and should be dismissed.

10         *First*, Plaintiff's claims fail because the Complaint's allegations establish, as a matter of

11   law, that Plaintiff consented to the challenged use of his name and likeness in emails promoting

12   the Add Connections feature.  By admitting that he had notice of and agreed to LinkedIn's User

13   Agreement and Privacy Policy, Plaintiff concedes that the terms of those agreements govern his

14   claims in this action.  *See id.* ¶ 16.  Indeed, Plaintiff explicitly relies on these agreements to

15   advance his claims.  *See, e.g.*, *id.* ¶¶ 16, 17, 19, 33–34.  The User Agreement and Privacy Policy

16   unambiguously demonstrate that LinkedIn members, including Plaintiff, give LinkedIn permission

17   to use their information and content in the very manner Plaintiff challenges.[1]  Among other things,

18   LinkedIn's Privacy Policy expressly provides that LinkedIn may "use[] Members information and

19   content for invitations and communications promoting our Services that are tailored to the

20   recipient," *see* Privacy Policy, § 2.4, which is precisely what Plaintiff alleges Add Connections

21   emails do.  Because Plaintiff consented to the use of his name and likeness in Add Connections

22   emails, this alone forecloses his claims.

23         *Second*, Plaintiff's claims fail on the additional ground that Plaintiff does not allege a

24   cognizable injury sufficient to establish Article III standing or to state a claim.  Plaintiff does not

25   _____

26   [1] *See* LinkedIn User Agreement, § 3.1, https://www.linkedin.com/legal/user-agreement
    [hereinafter User Agreement]; LinkedIn Privacy Policy, *Your Privacy Matters*, § 2.4,

27   https://www.linkedin.com/legal/privacy-policy [hereinafter Privacy Policy].  The User Agreement
    and Privacy Policy are properly subject to judicial notice.  *See* Request for Judicial Notice ("RJN")

28   at 2–3.

allege facts showing that Add Connections emails have caused "concrete," "particularized" economic harm to Plaintiff. *See Clapper v. Amnesty Int'l USA*, ––– U.S. –––, 133 S. Ct. 1138, 1147 (2013). Plaintiff's contention that the use of his name and likeness in Add Connections emails has economic value because it grows LinkedIn's member base is precisely the type of indirect and undefined injury held to be insufficient in *Cohen v. Facebook, Inc.*, 798 F. Supp. 2d 1090 (N.D. Cal. 2011) ("*Cohen I*") (Seeborg, J.), and *Cohen v. Facebook*, 2011 WL 5117164 (N.D. Cal. Oct. 27, 2011) ("*Cohen II*") (Seeborg, J.).

Plaintiff's core theory of liability and harm based on the use of member names and likenesses to grow LinkedIn's member base is extremely attenuated and uncertain. The theory hinges on the following chain of events:

- **Member A** used Add Connections;

- **Member B**, a LinkedIn member and connection of Member A, received an Add Connections email with Member A's name and likeness;

- **Member B *may have*** used Add Connections to both import contacts and send emails to non-LinkedIn members inviting them to join LinkedIn ***because of*** Member A's email;

- **Non-Member C**, one of Member B's imported contacts and a non-LinkedIn member, ***may have*** decided to join LinkedIn ***because of*** Member B's email thus growing LinkedIn's member base.

*See* Compl. ¶¶ 21–26. As this multi-party, multi-step chain of events demonstrates, Plaintiff's core allegations and theory of liability in this case—that LinkedIn uses member names and likenesses without member consent to grow its member base—are far too speculative to support the existence of cognizable injury under Article III, let alone the particularized monetary value to LinkedIn of any such increase. Plaintiff's conclusory allegations of emotional harm are also fatally flawed and fail as a matter of law.

For these reasons and those described further below, Plaintiff's claims should be dismissed under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

MOTION TO DISMISS COMPLAINT

# I.      BACKGROUND AND SUMMARY OF ALLEGATIONS

## A.      The Add Connections Networking Tool

Add Connections allows LinkedIn members to expand their professional networks by importing their contacts' email addresses from external email accounts and sending connection invitation and reminder emails to those contacts to join the members' LinkedIn networks. *See* Compl. ¶¶ 4, 9. As Plaintiff alleges, Add Connections allows "new and existing members to upload their external email address books (e.g., Outlook, Gmail, AOL, etc.)" and then "to send contact requests to anyone who is already on LinkedIn and also to send email invitations to anyone who is not already a member on LinkedIn suggesting that they join." *Id.* ¶ 4.

Plaintiff alleges that LinkedIn sends "periodic emails to its existing members" indicating that their connections have used Add Connections in order "to persuade those [members] to do the same thing." *Id.* ¶ 7. Plaintiffs includes the following sample Add Connections email in his Complaint, stating: "Join . . . Branton (Brandy) Lea . . . and 58 other connections who have already found people they know on LinkedIn." *Id.*



Compl. Figure 1.

MOTION TO DISMISS COMPLAINT

**B.      LinkedIn Members Consent To The Use of Their Names and Likenesses in Emails Promoting LinkedIn's Services**

To join LinkedIn, members enter their names, email addresses, and desired passwords on a LinkedIn registration screen and then click a button labeled "Join now."  *See* Compl. ¶ 16.  The registration screen tells members that "By clicking Join Now, you agree to LinkedIn's User Agreement, Privacy Policy, and Cookies Policy," with hyperlinks to each referenced document. *See id.*  As Plaintiff alleges, by clicking "Join now," he "agree[d] to LinkedIn's User Agreement, Privacy Policy and Cookie Policy."  *See id.*

LinkedIn allows members to enhance their profiles, by adding "additional information and content" about themselves to their profiles.  *See* Privacy Policy, § 1.3.  Members may choose to add professional details about themselves—such as descriptions of their professional experience or educational background—and other personal details—such as pictures or contact information.  *See id.*  Members may alter or remove this information and content from LinkedIn at any time.  *See id.* § 2.1.  Members may also remove their names and profile pictures from LinkedIn by closing their accounts.  *See id.*; User Agreement, § 5.

Plaintiff concedes that LinkedIn's User Agreement and Privacy Policy govern his claims in this action.  *See* Compl. ¶¶  16–17, 19.  In fact, Plaintiff attempts to use the User Agreement and Privacy Policy to advance his claims by alleging that California law applies to his claims because "LinkedIn's User Agreement includes a choice of law provision requiring the application of California law be applied to all disputes arising out of the User Agreement and LinkedIn's services."  *Id.* ¶¶ 33–34.

Through the User Agreement and Privacy Policy, LinkedIn obtains consent from its members to use their names and likenesses in Add Connections emails.  The Privacy Policy expressly tells members that their "information and content" may be used in promoting LinkedIn services.  *See* Privacy Policy, § 2.4.  Section 2.4 specifies that LinkedIn "use[s] Members information and content for invitations and communications promoting our Services that are tailored to the recipient."  *Id.*  To this end, several provisions of the Privacy Policy, including

§ 2.4, treat members' names and profile pictures as "information and content."[2]  Members also grant LinkedIn a license to use their information and content, which encompasses using this information in Add Connections emails.  *See* User Agreement, § 3.1.  Specifically, members grant LinkedIn "[a] worldwide, transferable and sublicensable right to use, copy, modify, distribute, publish, and process[] information and content that [they] provide through [LinkedIn's] Services, *without any further consent*, notice and/or compensation."  *See id.* (emphasis added).

### C.    Plaintiff's Claims

Plaintiff alleges that he "brings this action to remedy violations of the California Common Law Right of Publicity and California Unfair Competition Law in connection with LinkedIn's scheme to grow its business through the misappropriation of members' names and likenesses." *See* Compl. ¶ 1.  He alleges that LinkedIn used member names and likenesses in Add Connections emails without member consent and in a way that "implicitly suggests" that those members "endorse" the Add Connections feature.  *Id*. ¶¶ 7, 9, 31.[3]  According to Plaintiff, these implicit endorsements have "measurable commercial value" to LinkedIn because they increase the size of LinkedIn's member base.  *Id.* ¶¶ 3, 27, 28.  Plaintiff seeks to represent a class of "All natural persons whose name, photograph, likenesses, or identity was used without permission in an email sent by LinkedIn to advertise LinkedIn's contact uploader service."  *Id.* ¶ 36.

---

[2] Section 1, for example, discloses to members "What information [LinkedIn] collect[s]."  It informs members that LinkedIn may collect their "names," *see* Privacy Policy, § 1.2, and any "additional information" members decide to add to their LinkedIn profiles, which would include their pictures, *see id.* § 1.3.  *See also id.* § 2.1 ("The personal information that you provide to us . . . for example, your picture or your name . . . ."); *id.* § 2.4 ("[W]hen you sign in to your account, we may display the names and photos of new Members who have recently joined your network. . . . We also use Members information and content for invitations and communications promoting our Services that are tailored to the recipient."); *id.* § 2.6 ("Any information you put on your profile and any content you post on LinkedIn may be seen by others."); User Agreement, § 2.5 ("Our Services allow messaging and sharing of information in many ways, such as your profile, slide deck, links to news articles, job postings, InMails and blogs. Information and content that you share or post may be seen by other Members or, if public, by Visitors.").

[3] Solely "upon information and belief," Plaintiff also alleges that "the *vast majority* of users whose names and likenesses have been misappropriated to promote" Add Connections in Add Connections emails "never actually used" the service.  Compl. ¶ 10 (emphasis added).  Plaintiff provides no support or explanation for this allegation regarding Add Connections emails.  Nor does Plaintiff allege what effect, if any, this has on any of his claims.

## II.     LEGAL STANDARD FOR MOTION TO DISMISS

A Rule 12(b)(6) motion "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  A complaint "must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Though the Court accepts all allegations of material fact as true and construes the pleadings in the light most favorable to the plaintiffs, *Faulkner v. ADT Sec. Servs., Inc.*, 706 F.3d 1017, 1019 (9th Cir. 2013), it should not accept mere "labels and conclusions," nor a "formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

In addition, "[a] federal court must ask whether a plaintiff has suffered sufficient injury to satisfy the 'case or controversy' requirement of Article III of the U.S. Constitution." *Perkins v. LinkedIn Corp.*, No. 13-CV-04303-LHK, 2014 WL 2751053, at *9 (N.D. Cal. June 12, 2014) (Koh, J.)  A plaintiff's "conclusory and bare bones words and phrases without any factual content . . . are insufficient to establish standing or to survive a motion to dismiss." *Perez v. Nidek Co.*, 711 F.3d 1109, 1113 (9th Cir. 2013); *see also Harwood Inv. Co. v. Wells Fargo Bank, Nat. Ass'n.*, No. C-09-3410 EMC, 2009 WL 4251650, at *1 (N.D. Cal. Nov. 24, 2009) (Chen, J.) ("Conclusory allegations, or 'naked assertions devoid of further factual enhancement' cannot suffice." (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

In making its determination, the Court may consider documents referenced in the complaint and relevant matters subject to judicial notice. *Lapidus v. Hecht*, 232 F.3d 679, 682 (9th Cir. 2000); *Perkins*, 2014 WL 2751053, at *7–8.  The Court does not need to "accept as true allegations contradicted by judicially noticeable facts." *In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1024 (N.D. Cal. 2014) (Koh, J.) (citing *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000)).

1

## III.   ARGUMENT

2

### A.   Plaintiff's Common Law Right of Publicity Claim Should Be Dismissed Because Plaintiff Consented To The Challenged Use

3

4

#### 1.   LinkedIn's User Agreement and Privacy Policy Establish Consent as a Matter of Law

5

6
To state a claim for violation of California's common law right of publicity, Plaintiff must

7
show lack of consent.[4]  Although he attempts to make that showing by relying on LinkedIn's User

8
Agreement and Privacy Policy, which he admits he had notice of and agreed to, those documents

do the opposite:  They establish consent as a matter of law.

9

10
Claims based on lack of consent can be dismissed on the pleadings where the allegations

11
establish consent to the challenged conduct.  *See, e.g.*, *Perkins*, 2014 WL 2751053, at *13–16

(concluding as a matter of law that plaintiffs "consented to or authorized the collection of email

12
addresses . . . [and] consented to LinkedIn's initial endorsement email" and granting defendant's

13
motion to dismiss those claims); *Ibey v. Taco Bell Corp.*, No. 12–CV–0583–H (WVG), 2012 WL

14
2401972, at *3 (S.D. Cal. June 12, 2012) (dismissing claim where "Plaintiff expressly consented

15
to contact by Defendant").  "Consent is determined from the reasonable viewpoint of another

16
person, not from Plaintiff's unexpressed subjective beliefs."  *Jones v. Corbis Corp.*, 815 F. Supp.

17
2d 1108, 1112 n.2 (C.D. Cal. 2011) (citing Restatement (Second) of Torts § 892).

18
Plaintiff admits that, upon joining LinkedIn, he "agree[d] to LinkedIn's User Agreement,

19
Privacy Policy and Cookie Policy," Compl. ¶ 16, thus demonstrating that he had notice of and

20
agreed to the terms of those documents.  *See Yahoo*, 7 F. Supp. 3d at 1029 ("Plaintiffs concede

21
that the ATOS, TOS, and Privacy Policy all 'comprise the agreement between Yahoo and its

22
users.'" (citations omitted)).  Accordingly, under California law, LinkedIn's User Agreement and

23
Privacy Policy are binding on Plaintiff.  *See* Compl. ¶ 33 ("Application of California law to all

24
class members' claims is appropriate.").

25

---

26
[4] California's common law right of publicity has four elements: "(1) the defendant's use of the
plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage,

27
commercially or otherwise; (3) lack of consent; and (4) resulting injury."  *Cohen I*, 798 F. Supp.
2d at 1093–94 (quoting *Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 692 (9th Cir. 1998)).

28

Even without this admission, the User Agreement and Privacy Policy are determinative as a matter of law.  Courts routinely rely upon websites' terms of services, especially where, as Plaintiff similarly alleges here, the user is "provided with an opportunity to review the terms of service in the form of a hyperlink immediately under the I accept button and [ ] admittedly clicked 'Accept.'"  *Moretti v. Hertz Corp.*, No. C 13-02972 JSW, 2014 WL 1410432, at *2 (N.D. Cal. Apr. 11, 2014) (White, J.) (quoting *Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 912 (N.D. Cal. 2011)).[5]  Similarly, here, users must click "Join now" on a LinkedIn registration screen to join LinkedIn, and are told that "By clicking Join Now, you agree to LinkedIn's User Agreement, Privacy Policy, and Cookies Policy," with hyperlinks to each referenced document. *See* Compl. ¶ 16.  And, as noted, courts examine websites' terms of service to determine whether users have consented to the challenged practices.  *See, e.g.*, *In re Google Inc.*, No. 13-MD-02430-LHK, 2013 WL 5423918, at *13 (N.D. Cal. Sept. 26, 2013) (Koh, J.) (examining Google's Terms of Service to determine whether users explicitly consented to the alleged interceptions at issue).

Thus, just as in *Yahoo* and *Google*, the Court need only determine whether LinkedIn's User Agreement and Privacy Policy "sufficiently establish[d] user consent by putting users on notice of [LinkedIn's] alleged conduct."  *Yahoo*, 7 F. Supp. 3d at 1029; *Google*, 2013 WL 5423918, at *13.  As explained below, they did.

### 2. Plaintiff Consented to The Use Of His Name and Likeness In Add Connections Emails

Plaintiff alleges that the use of his name and likeness in Add Connections emails was unauthorized.  *See* Compl. ¶ 10.  The allegations in the Complaint, however, demonstrate that Plaintiff consented to LinkedIn's use of this information and content.

---

[5] *See also Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 839–40 (S.D.N.Y. 2012) (where page provides by "'By clicking Sign Up, you are indicating that you have read and agree to the Terms of Service.'" and phrase "'Terms of Service' is underlined, an indication that the phrase is a hyperlink, a phrase that is 'usually highlighted or underlined' and 'sends users who click on it directly to a new location—usually an internet address or a program of some sort," plaintiff "was informed of the consequences of his assenting click and he was shown, immediately below, where to click to understand those consequences.  That was enough."); *Zaltz v. JDATE*, 952 F. Supp. 2d 439, 453–54 (E.D.N.Y. 2013) (same); *5381 Partners LLC v. Shareasale.com, Inc.*, No. 12–CV–4263 (JFB)(AKT), 2013 WL 5328324, at *7 (E.D.N.Y. Sept. 23, 2013) (same).

LinkedIn's Privacy Policy expressly discloses to members that LinkedIn uses member information and content to promote its services. *See* Privacy Policy, § 2.4. It explains that LinkedIn "use[s] Members information and content for invitations and communications promoting our Services that are tailored to the recipient," which is exactly how Plaintiff claims LinkedIn used his information. *Compare id.*, with Compl. ¶ 7. Add Connections emails are (1) "invitations and communications" ("emails"); (2) that "promot[e] [LinkedIn] Services" (Add Connections); and (3) that "are tailored to the recipient" (by "invit[ing] the recipient to 'join' th[eir] connections" who "have already found people they know on LinkedIn"). *See* Compl. ¶ 7. Names and profile pictures are "information and content" within the meaning of the Privacy Policy. Section 1 of the Privacy Policy, for example, discloses to members "What information [LinkedIn] collect[s]." That section informs members that LinkedIn may collect their "names," *see id.* § 1.2, and any "additional information" members decide to add to their LinkedIn profiles, which would include any pictures added, *see id.* § 1.3.[6] The plain language of § 2.4 of the Privacy Policy shows that Plaintiff consented to LinkedIn's use of his name and likeness in Add Connections emails, and this alone forecloses his right of publicity claim.

The User Agreement likewise shows that LinkedIn had permission to use member information and content in Add Connections emails. Under the User Agreement, members grant LinkedIn broad licenses to use their information and content. *See* User Agreement, § 3.1. Per the terms of that license, LinkedIn may "use, copy, modify, distribute, publish, and process[] information and content that [the member] provide[s] through [LinkedIn's] Services, without any further consent, notice and/or compensation." *Id.* (emphasis added). By sending Add

---

[6] *See also* Privacy Policy, § 2.1 ("The personal information that you provide to us . . . for example, your picture or your name . . . ."); *id.* § 2.4 ("[W]hen you sign in to your account, we may display the names and photos of new Members who have recently joined your network. . . . We also use Members information and content for invitations and communications promoting our Services that are tailored to the recipient."); *id.* § 2.6 ("Any information you put on your profile and any content you post on LinkedIn may be seen by others."); User Agreement, § 2.5 ("Our Services allow messaging and sharing of information in many ways, such as your profile, slide deck, links to news articles, job postings, InMails and blogs. Information and content that you share or post may be seen by other Members or, if public, by Visitors.").

Connections emails, LinkedIn "use[s]" or "distribute[s]" "information and content" that members have "provide[d]" to LinkedIn. *Compare id.*, with Compl. ¶ 7. The User Agreement and the Privacy Policy thus plainly demonstrate that Plaintiff consented to LinkedIn's use of his information and content in Add Connections emails.

The two sections of the Privacy Policy that Plaintiff selectively quotes in the Complaint are neither relevant to nor conflict with the above disclosures and license. Section 2.6, which is titled "Sharing Information with Third Parties," provides that LinkedIn generally "will not disclose personal information that is not published to your profile or generated through engagement with our other services" to third parties absent "separate consent" from the member, except in certain circumstances. Privacy Policy, § 2.6 (emphasis added). That section does not concern Add Connections emails because Plaintiff concedes that Add Connections emails are sent only to LinkedIn members, not third parties. *See* Compl. ¶ 21. The Privacy Policy explicitly treats LinkedIn "members" and "third parties" as two distinct groups. *See*, e.g., Privacy Policy, § 2.8 ("Polls and Surveys may be conducted by us, Members, or third parties.").[7] In any event, § 2.6 refers only to "personal information that is not published to [the member's] profile or generated through engagement with [LinkedIn's] other services," Privacy Policy, § 2.6, and Plaintiff's claims challenge the use of his name and profile picture, which he does not and cannot dispute are published to his profile.

Likewise, Section 2.11 of the Privacy Policy is irrelevant to the challenged use because that section applies only to "Testimonials and Advertisements Placed Through LinkedIn Ads." *See* Compl. ¶ 17. Section 2.11 provides, "If you provide any testimonials about our goods or services or place advertisements through the LinkedIn Ads, we may post those testimonials and examples of advertisements you place in connection with our promotion of these services to third

---

[7] *See also* Privacy Policy, § 2.6 ("Third parties (for example, your email provider) may give you the option to upload certain information in your contacts stored with us onto their own service."); *id.* § 2.10 ("[Y]ou should be aware that any information you choose to disclose using these services can be read, collected, and used by other Members in these forums, developers, and other third parties, including advertisers."); *id.* § 2.16 ("We may employ third party companies and individuals to facilitate our Services (e.g. maintenance, analysis, audit, marketing and development).").

parties.  Testimonials and advertisements may include your name and other personal information that you have provided."  Privacy Policy, § 2.11 (emphasis added).  Plaintiff has not alleged that LinkedIn used his information in a "testimonial" that he provided or in an "advertisement" that he placed through "LinkedIn Ads."  *See id.*  In fact, LinkedIn Ads is a separate service that allows members or other third parties to place their own advertisements on LinkedIn.[8]  *See id.*  Indeed, because Add Connections emails are sent by LinkedIn, *see* Compl. ¶ 7, these emails cannot be testimonials or advertisements placed by Plaintiff through LinkedIn Ads.  *See* Privacy Policy, § 2.4.

Finally, Plaintiff complains that LinkedIn "never even made [members] aware" that it had used their names and likenesses in Add Connections emails.  Compl. ¶ 10.  Because LinkedIn obtained members' consent for the use of their names and likenesses, LinkedIn's alleged failure to inform members after-the-fact is legally irrelevant.  *Cf. Maxwell v. Dolezal*, 179 Cal. Rptr. 3d 807, 811 (Cal. Ct. App. 2014) ("[T]he allegations . . . only serve to make clear that Maxwell and Dolezal did in fact enter into an agreement in which Maxwell authorized Dolezal to use his identity.  Accordingly, Maxwell has failed to plead sufficient facts concerning lack of consent to state a cause of action for common law misappropriation of name or likeness . . . . The trial court properly sustained the demurrer with respect to this cause of action.").

Because Plaintiff admits that he agreed to LinkedIn's User Agreement and Privacy Policy, which are properly subject to judicial notice, and those agreements establish as a matter of law that Plaintiff consented to the use of his name and likeness in Add Connections emails, Plaintiff's claims should be dismissed under Rule 12(b)(6) for failure to state a claim.

**B.     Plaintiff Lacks Article III Standing and Has Failed To Allege Any Cognizable Injury**

Plaintiff's claims are also subject to dismissal under Rule 12(b)(1) because he does not allege any cognizable injury to satisfy the standing requirements of Article III of the U.S.

---

[8] *See LinkedIn Ads Agreement*, available at https://www.linkedin.com/legal/pop/pop-sas-terms ("You may only advertise for yourself or your current employer or, if you are an advertising agency, for your client.").  LinkedIn Ads Agreement is properly subject to judicial notice.  *See* RJN at 2, 4.

Constitution.  For this same reason, Plaintiff also fails to adequately allege any injury, which is "the *sine qua non* of a cause of action for misappropriation of name."  *Cohen I*, 798 F. Supp. 2d at 1097 (quoting *Slivinsky v. Watkins-Johnson Co.*, 270 Cal. Rptr. 585, 590 (Cal. Ct. App. 1990)).  Accordingly, Plaintiff's right of publicity claim also should be dismissed under Rule 12(b)(6) for failure to state a claim.

"To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'"  *Clapper*, 133 S. Ct. at 1147 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)).  Plaintiff must allege a "coherent and factually supported theory of what that injury might be," which means a "particularized example of economic injury or harm," not simply "abstract concepts" such as "value-for-value exchanges."  *In re iPhone Application Litig.*, No. 11–MD–02250–LHK, 2011 WL 4403963, at *5–6 (N.D. Cal. Sept. 20, 2011) (Koh, J.) (citations and internal quotation marks omitted).[9]  Moreover, the "line of causation" between the defendant's alleged conduct and the injury alleged must not be "too attenuated."  *Allen v. Wright*, 468 U.S. 737, 752 (1984).

Here, Plaintiff does not allege any "coherent and factually supported" theory of economic harm that could support a showing of injury in fact.  In *Cohen,* the plaintiffs challenged the use of their names and likenesses by Facebook to promote Facebook's Friend Finder service, which, like Add Connections, allowed members to search contacts from external email accounts to identify and invite contacts who were not Facebook members to become their "friends" on Facebook. 798 F. Supp. 2d at 1092.  Facebook promoted the Friend Finder service by notifying members that

---

[9] *See also In re Doubleclick Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 525 (S.D.N.Y. 2001) (holding that unauthorized collection of personal information does not constitute "economic loss to the subject"); *La Court v. Specific Media, Inc.*, No. SACV 10–1256–GW(JCGx), 2011 WL 1661532, at *5 (C.D. Cal. Apr. 28, 2011) (holding that plaintiffs failed to adequately allege injury in fact because they provided no facts showing that they "ascribed an economic value" to their personal information, attempted a value-for-value exchange of information, or were deprived of its value); *In re JetBlue Airways Corp. Privacy Litig.*, 379 F. Supp. 2d 299, 327 (E.D.N.Y. 2005) ("There is [ ] no support for the proposition that an individual JetBlue passenger's personal information has or had any compensable value in the economy at large.").

1    certain of their "friends" had used the service and encouraging them to "[g]ive it a try!"  *Id.*  The

2    notices included the names and profile pictures of the "friends" who had used the service.  *Id.*  As

3    the Court noted, the Friend Finder service "had an economic value to Facebook" because its use

4    "can be seen as serving a commercial purpose, undertaken with at least the intent of achieving

5    growth in Facebook's user base, thereby ultimately resulting in monetary gain for Facebook."

6    *Cohen II*, 2011 WL 5117164, at *2.  The Court held that such allegations, even if true, however,

7    did not identify a cognizable economic injury, and dismissed the claim in both the original and

8    amended complaints.  *Id.* at *3; 798 F. Supp. 2d at 1097.[10]

9          The same is true here.  Plaintiff has not alleged facts showing that LinkedIn's alleged use

10   of his name and likeness in Add Connections emails caused him "concrete," "particularized"

11   economic injury.  *Id.*  As in *Cohen*, the sole basis for his claimed injury is that Add Connections

12   emails lead to the growth of LinkedIn's member base which in turn leads to commercial

13   advantages for LinkedIn.  *See* Compl. ¶¶ 3, 4, 5, 6, 20, 26–30.  As demonstrated, the mere

14   allegation that the use of one's name and likeness grows LinkedIn's member base, without more,

15   is insufficient to constitute cognizable injury under Article III.

---

[10] *Cf. Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 799–800 (N.D.Cal. 2011) (distinguishing *Cohen* and holding that plaintiffs had "articulated a coherent theory of how they were economically injured by the misappropriation of their names, photographs, and likenesses" where they "allege[d] that their individual, personalized endorsement of products, services, and brands to their friends and acquaintances has *concrete, provable value* in the economy at large, which can be measured by the additional profit Facebook earns from selling Sponsored Stories compared to its sale of regular advertisements" and they "identified a direct, linear relationship between the value of their endorsement of third-party products, companies, and brands to their Facebook friends, and the alleged commercial profit gained by Facebook" (emphasis added)).

And in any event, the alleged causal link between the challenged use and any subsequent member growth is far "too attenuated" to satisfy the requirements of Article III. *Allen*, 468 U.S. at 752. Plaintiff can only claim injury based on the growth in LinkedIn's member base, and associated economic benefit, if he can trace that growth to Add Connections emails through the following chain of events resulting in new LinkedIn members:

- **Member A** used Add Connections;

- **Member B**, a LinkedIn member and connection of Member A, received an Add Connections email with Member A's name and likeness;

- **Member B** *may have* used Add Connections to both import contacts and send emails to non-LinkedIn members inviting them to join LinkedIn *because of* Member A's email;

- **Non-Member C**, one of Member B's imported contacts and a non-LinkedIn member, *may have* decided to join LinkedIn *because of* Member B's email thus growing LinkedIn's member base.

*See* Compl. ¶¶ 21–26. Plaintiff's theory of harm therefore turns on the knowledge, intent, and conduct of three different people, each of whom may have decided to take the actions they took for any number of reasons having nothing to do with the use of Plaintiff's name and likeness in Add Connections emails. *See Coho Salmon v. Pac. Lumber Co.*, 30 F. Supp. 2d 1231, 1243 (N.D. Cal. 1998) ("The causal link between the alleged harm and the challenged conduct may become too attenuated 'if the injury complained of is the result of the independent action of some third party not before the court.'" (quoting *Bennett v. Spear*, 520 U.S. 154, 169 (1997)). As this chain demonstrates, Plaintiff have failed to allege a sufficiently concrete link between Add Connections emails and any increase in LinkedIn's member base, let alone the monetary value to LinkedIn of any such increase.

The alleged causal connection between Add Connections emails and the growth of LinkedIn's member base is far more attenuated and uncertain than in *Perkins*. In *Perkins,* the plaintiffs challenged the use of member names and likenesses in emails sent to *non*-LinkedIn members inviting them to join LinkedIn. *See Perkins*, 2014 WL 2751053, at *3. The Court held that, based on these allegations, the *Perkins* plaintiffs had adequately alleged Article III injury because "LinkedIn's use of users' names to promote LinkedIn's services is undertaken with the

intent to grow LinkedIn's user base and ultimately result in commercial advantage to LinkedIn." *Id.* at \*22.  Plaintiff's claims are based on the same core theory of liability and injury and overall chain of events—the use of member names and likenesses to grow LinkedIn's member base—but depend on an alleged causal connection that is significantly more protracted and uncertain which distinguishes this case from the Court's reasoning in *Perkins*.  The alleged causal connection in *Perkins*, between emails sent to non-LinkedIn members inviting them to join LinkedIn and growing LinkedIn's member base, was attenuated and uncertain because the recipients of those emails **may or may not** have decided to join LinkedIn as a result of those emails.  Here, Plaintiff's claims hinge on emails sent to existing LinkedIn members who **may or may not** have decided to import contacts and send emails to non-LinkedIn members as a result of those emails, **and** on the non-LinkedIn members who received those emails and **may or may not** have decided to join LinkedIn as a result.  *Compare Perkins*, 2014 WL 2751053, at \*3, *with* Compl. ¶ 7.  Plaintiff here has failed to allege a "direct, linear relationship" between the claimed "implicit endorsement" and any new members gained by LinkedIn.  *Fraley*, 830 F. Supp. 2d at 799–800.  Furthermore, as in *Cohen* and unlike *Perkins*, "this is not a situation where the defendant is alleged to have publicized the plaintiffs' names or likenesses to any audience or in any context where they did not already appear," as they were sent to Plaintiff's *own existing LinkedIn connections*, as opposed to the *non-LinkedIn members* in *Perkins*, which "further undercuts any claim plaintiffs can make that they were somehow harmed."  *Cohen II*, 2011 WL 5117164, at \*3.

　　Because Plaintiff alleges no facts that could provide the necessary baseline for a concrete commercial value, he resorts to alternative "calculations" based on other networking tools that have nothing to do with the purported monetary value of Add Connections emails.  For example, Plaintiff suggests that these emails provide LinkedIn the same value as the amount it charges members to use its InMail networking tool.[11]  Plaintiff, however, provides no rationale as to why these two completely different services deliver the same value to LinkedIn.  InMail allows

---

[11] *See* Compl. ¶ 26 ("[T]here is measurable value to LinkedIn in using the names and likenesses of members to endorse the service.  LinkedIn charges its own members around $10 per email to send emails to members with whom they are not connected.").

members to contact other LinkedIn members with whom they have had no previous communication (and thus do not have their email addresses), and to customize the content of the message without space or other applicable limitations. *See* Blavin Decl., Ex. D. In contrast, Add Connections emails (1) are sent *by LinkedIn*—not the member—and thus are not a communication at all between LinkedIn members; (2) are sent only to the member's existing connections; and (3) include a standardized message set by LinkedIn. *See* Compl. ¶ 7.

Plaintiff also suggests, again without support, that Add Connections emails have the same value as the price of premium LinkedIn services. Compl. ¶ 27. This suggestion simply recycles Plaintiff's attempt to link Add Connections emails with an increase in LinkedIn's member base. Plaintiff simply cannot demonstrate any "concrete," "particularized" link between Add Connections emails and an increase in the sale of premium LinkedIn services, in light of the fact that these emails are only sent to existing members, they do not mention LinkedIn's premium services, and, in any event, only a small percentage of LinkedIn members have premium accounts.

As for non-economic harm, Plaintiff pleads that Add Connections emails cause "serious reputational concerns," because "they create the inference that Plaintiff and Class members have endorsed a LinkedIn service which carries with it serious privacy concerns." *See* Compl. ¶ 32. This theory of harm also is fatally flawed and does not plead a cognizable theory of injury. First, Plaintiff has not provided any basis to substantiate his claim that Add Connections emails damaged his "professional reputation." *Id.* at ¶ 62. His conclusory allegations do not demonstrate a plausible entitlement to relief. *See Cohen I*, 798 F. Supp. 2d at 1097 ("[E]ven if plaintiffs had included a conclusory assertion of 'hurt feelings,' they have alleged no facts that would suffice to show a plausible entitlement to relief."). Moreover, Plaintiff's emotional harm was allegedly caused by LinkedIn sharing his name and profile picture, which Plaintiff had already previously made accessible to his LinkedIn connections—the only people that received the Add Connections emails. Under *Cohen*, this type of disclosure cannot have resulted in cognizable emotional

MOTION TO DISMISS COMPLAINT

harm.[12]  Finally, the "serious privacy concerns" Plaintiff alludes to – which involve allegations concerning LinkedIn's importation and storage of members' email address contacts[13] – have nothing to do with the claims he has brought concerning the unauthorized use of his name or image in Add Connections emails.  Plaintiff has not brought any claims regarding LinkedIn's collection or storage of his email addresses, and so he cannot claim any supposed "reputational" harm associated with those completely unrelated alleged practices.[14]

### C.   Plaintiff's Derivative UCL Claims Should Be Dismissed

#### 1.   There Are No "Unlawful" or "Unfair" Act Predicates

Plaintiff's UCL claims are derivative of his right of publicity claim, and therefore also require Plaintiff to show a lack of consent.  Plaintiff bases his "unlawful" UCL claim on a violation of California's right of publicity claim.  *See* Compl. ¶ 59 ("Defendant has violated § 17200's prohibition against engaging in unlawful acts and practices by violating the California Common Law Right of Publicity.").  His "unfair" UCL claim similarly relies solely on LinkedIn's "unauthorized use" of his name and likeness.  *See id.* ¶ 60.[15]

---

[12] *See Cohen I*, 798 F. Supp. 2d at 1097 ("Plaintiffs have not shown how the mere disclosure to their Facebook friends that they have employed the Friend Finder service (even assuming some of them did not) causes them any cognizable harm, regardless of the extent to which that disclosure could also be seen as an implied endorsement by them of the service."); *Cohen II*, 2011 WL 5117164, at *3 ("[T]his is not a situation where the defendant is alleged to have publicized the plaintiffs' names or likenesses to any audience or in any context where they did not already appear—rather, the names and likenesses were merely displayed on the pages of other users who were already plaintiffs' Facebook 'friends' and who would regularly see, or at least have access to, those names and likenesses in the ordinary course of using their Facebook accounts. . . . [T]his further undercuts any claim plaintiffs can make that they were somehow harmed.").

[13] *See* Compl. ¶ 32 ("Namely, the emails from LinkedIn indicate that Plaintiff and the Class members encourage the recipient to allow LinkedIn to access their private email account, and to download and retain in perpetuity email addresses and other information regarding every person with whom the member has ever had email contact.").

[14] In any event, the Court held in *Perkins* that LinkedIn members consented as a matter of law to LinkedIn both accessing and importing members' email address contacts.  2014 WL 2751053 at *13–15.

[15] Even though Plaintiff alleges that "the vast majority of users whose names and likenesses have been misappropriated to promote the contact uploader service never actually used the contact uploader service," *see* Compl. ¶ 10, he has not brought any claims based on the fraud prong of the

---

-18-                                           15-cv-00236 EJD

Because Plaintiff's right of publicity claim fails, these derivative claims premised on the same violation equally fail for the same reasons. *See, e.g.*, *Aleksick v. 7-Eleven, Inc.*, 140 Cal. Rptr. 3d 796, 801 (Cal. Ct. App. 2012) ("When a statutory claim fails, a derivative UCL claim also fails."); *Gregory v. Albertson's Inc.*, 104 Cal. App. 4th 845, 853–54 (Cal. 2002) (holding that "unfair" claim must be "tethered" to "specific constitutional, statutory or regulatory provisions").

2.     **Plaintiff's Derivative UCL Claims Fail for Lack of Statutory Standing**

To have standing to sue under the UCL, Plaintiff must show that he "has suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. As set forth above, Plaintiff has not alleged sufficient facts to show injury in fact based on LinkedIn sending Add Connections emails. Nor has he adequately alleged that Add Connections Emails resulted in the loss of money or property recoverable as restitution under the UCL. Indeed, Plaintiff does not allege that he has ever paid any money to LinkedIn. *See Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 943 (Cal. 2003) ("[U]nder the UCL, prevailing plaintiffs are generally limited to injunctive relief and restitution." (citation and internal quotation marks omitted)).

**IV.     CONCLUSION**

For these reasons, the Court should dismiss Plaintiff's Complaint.

_____

UCL. In fact, Plaintiff's allegations foreclose his ability to bring a UCL fraud claim. To assert a UCL fraud claim, Plaintiff must be able to show that he actually and reasonably relied upon the claimed misrepresentation. *See In re Tobacco II Cases*, 207 P.3d 20, 40 (Cal. 2009) (requiring that a plaintiff "plead and prove actual reliance to satisfy the standing requirement of section 17204"). Plaintiff, however, does not and cannot allege that he relied upon any of the alleged misrepresentations, because the Add Connections emails were sent to other LinkedIn members, and not to Plaintiff himself. *See* Compl. ¶ 7.

1   DATED:  April 10, 2015                    MUNGER, TOLLES & OLSON LLP

2

3
                                             By:      _/s/ Jerome C. Roth_____
4                                                       JEROME C. ROTH
                                             Attorneys for Defendant
5                                            LINKEDIN CORPORATION

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION TO DISMISS COMPLAINT